**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MENDELSOHN, DRUCKER & ASSOCIATES | : | CIVIL ACTION |
| v. | : | |
| TITAN ATLAS MANUFACTURING, INC., et al. | : | NO. 12-453 |

**MEMORANDUM RE: DEFENDANTS' MOTION TO DISMISS**

**Baylson, J.**                                                                                  **August 8, 2012**

**I.      Introduction**

This case involves claims of breach of contract[1] and common law fraudulent inducement arising out of a client's failure to pay legal fees.  Plaintiff is the law firm Mendelsohn, Drucker & Associates ("Mendelsohn") and Defendants are Titan Atlas Manufacturing ("Titan") and its CEO Jeremy Blackburn ("Blackburn").  Mendelsohn brings claims of breach of contract and fraudulent inducement against Titan as well as a claim of fraudulent inducement against Blackburn in his individual capacity.

Presently before the court is Defendants' Motion to Dismiss for lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted, under Federal Rules of Civil Procedure, 12(b)(2), 12(b)(3), and 12(b)(6), respectively.  For the reasons discussed below, Defendants' Motion is denied.

---

[1] Mendelsohn also brings claims of quantum meruit and unjust enrichment against Titan.  Compl. ¶¶ 120-130.  Because those claims stem from the contract claim, they will be considered within the breach claim for purposes of deciding the personal jurisdiction issue.

1

**II.     Factual Allegations**

Mendelsohn is a law firm located in Philadelphia.  Compl. ¶ 2.  Titan is a Delaware

corporation located in South Carolina.  Compl. ¶ 3.  Blackburn is the CEO of Titan and resides

part-time in New York and part-time in South Carolina.  Compl. ¶ 4; Blackburn Aff. ¶¶ 3-4 (Ex.

C to Defs.' Br.).[2]

The Complaint alleges that on February 4, 2011, Titan hired Mendelsohn as legal counsel

through the execution of an Engagement Letter that detailed, in relevant part, Mendelsohn's

billing requirements for all services.  Compl. ¶ 11; Ex. A to Compl.  On April 3, 2011,

Mendelsohn entered a Joint Representation Agreement with Titan and its customer, Strata Mine

Services ("Strata").  Compl. ¶ 16.  Titan had previously entered a Purchase and Indemnification

Agreement with Strata, indemnifying Strata against costs and attorney's fees arising from any

conflict with Frank A. Sisk ("Sisk") or his company, Precision Mine Repair, Inc. ("PMR"),

relating to a particular patent.  Compl. ¶ 12.

On January 17, 2011, Mendelsohn commenced action in the Western District of Virginia

on behalf of Titan and Strata against Sisk and PMR.  Compl. ¶¶ 14-15, 17-18; Pl.'s Br. at 6.  Sisk

and PMR filed a cross-claim in the Southern District of Illinois on April 5, 2011, and

Mendelsohn represented Titan in that case as well.  Compl. ¶¶ 19-21.  The Illinois litigation was

transferred to Virginia on September 8, 2011, and the two Titan cases were consolidated in

Virginia on September 22, 2011.  Compl. ¶ 22.

---

[2] The Complaint references Blackburn's position as Titan's CEO only in the heading and asserts
on information and belief that Blackburn resides full time in New York.  Compl. ¶ 4.
Blackburn's position and residencies are clarified in his affidavit and are not in dispute.
Blackburn Aff. ¶¶ 3-4.

Throughout representation, Titan failed to provide timely payment for legal services rendered and Mendelsohn repeatedly contacted Titan to remedy the situation. Compl. ¶¶ 41-65. Blackburn repeatedly gave assurances to Mendelsohn attorneys that payment was forthcoming. Compl. ¶¶ 33-34, 46-52, 54, 56, 62. By September of 2011, Titan's unpaid legal dues totaled $244,563.78. Compl. ¶ 35. On September 8, 2011, Blackburn agreed by phone to pay Mendelsohn $10,000 per week towards Titan's balance. Compl. ¶¶ 35, 66. Pursuant to this agreement, Mendelsohn received a $10,000 payment from Titan on September 19, 2011. Compl. ¶¶ 35, 70-71.

On September 27, 2011, Blackburn sent an email to Mendelsohn that included a United States Postal Service ("U.S.P.S.") Priority Mail tracking number for the second weekly $10,000 payment. Compl. ¶¶ 72-73. Relying on the September 27 email, Mendelsohn filed an Answer to an Amended Complaint in the consolidated litigation, instead of filing a Motion to Withdraw. Compl. ¶ 77. Mendelsohn never received the September 27 payment and the U.S.P.S. reported that the provided tracking number did not match any envelope sent. Compl. ¶¶ 74-76. Mendelsohn emailed Blackburn on September 30, 2011, requesting a replacement check and advising Blackburn that Mendelsohn would require compliance with the payment schedule in order to continue representation. Compl. ¶ 80. Blackburn replied that he understood and that payment would be forthcoming. Compl. ¶ 81. Blackburn repeated this promise of payment, though payment was never received by Mendelsohn. Compl. ¶¶ 82-105. On November 23, 2011, Mendelsohn filed a Motion to Withdraw in the Virginia Litigation. Compl. ¶¶ 106. Titan opposed this Motion, but failed to respond to Mendelsohn's further requests for payment. Compl. ¶¶ 107-10.

3

On December 5, 2011, Mendelsohn's Motion to Withdraw was granted.  Compl. ¶¶ 25, 111.  As of January 27, 2012,[3] Titan owed Mendelsohn $402,511.06.  Compl. ¶ 26.

Mendelsohn brings claims against Titan for breach of contract and fraudulent inducement.[4]  Compl. ¶¶ 112-119, 170-172.  Mendelsohn also raises a claim of fraudulent inducement against Blackburn in his individual capacity.  Compl. ¶¶ 131-169.

Titan moved to dismiss Mendelsohn's claims for lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted.  Titan filed a memorandum supporting this movement (ECF No. 21), to which Mendelsohn filed a response, (ECF No. 24).  Titan then filed a reply brief (ECF No. 25), and, after requesting and receiving permission (ECF Nos. 25-29), Mendelsohn filed a sur-reply brief under seal (ECF No. 30)  The Court heard oral argument on July 26, 2012.

## III.    Jurisdiction

This Court has subject-matter jurisdiction because Mendelsohn is a Pennsylvania company, Titan is a Delaware corporation located in South Carolina, Blackburn is a resident of New York and South Carolina, and the amount in controversy exceeds $75,000.  See 28 U.S.C. § 1332; Compl. ¶¶ 2-5; Blackburn Aff. ¶¶ 3-4.

## IV.    Personal Jurisdiction

### A.    Legal Standard

"Under Federal Rule of Civil Procedure 4(k), a District Court typically exercises personal jurisdiction according to the law of the state where it sits.  O'Connor v. Sandy Lane Hotel, Ltd.,

---

[3] This is the date on which Mendelsohn filed the Complaint in this case.
[4] In the Complaint, Mendelsohn also refers to fraudulent inducement as "common-law fraud" upon which Mendelsohn relied.  Compl. at 21, 26.

496 F.3d 312, 316 (3d Cir. 2007).  Pennsylvania's long-arm statute provides that a court may

exercise personal jurisdiction over non-residents "to the fullest extent allowed under the

Constitution of the United States . . ."  42 Pa. Cons. Stat. Ann. § 5322(b).

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction.

See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn.8-9 (1984).

Mendelsohn conceded in its Brief that Titan lacks the contacts necessary to support general

jurisdiction, see Pl.'s Br. at 2, so this Court only considers specific jurisdiction here.

The test for specific jurisdiction is satisfied where (i) a defendant purposefully directed

activities at the forum state, (ii) the claim arises out of or is related to those activities, and (iii) the

court's exercise of jurisdiction would not offend traditional notions of fair play and substantial

justice.  D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir.

2009) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 476 (1985); Helicopteros, 466

U.S. at 414).

### i.   Purposeful Direction

In analyzing specific jurisdiction in the context of a breach of contract claim, district

courts consider "whether the defendant's contacts with the forum were instrumental in either the

formation of the contract or its breach."  Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir.

2001).  By creating "continuing obligations between [themselves] and residents of the forum,"

parties may purposely avail themselves of the forum state.  Burger King, 471 U.S. at 476.  The

mere existence of a contract, however, "is insufficient to establish minimum contacts."  Metcalfe

v. Renaissance Marine, Inc., 566 F.3d, 324, 333 n.7 (3d Cir. 2009).  The court evaluates "the

totality of the circumstances, including the location and character of the contract negotiations, the

terms of the contract, and the parties' actual course of dealing."  Remick v. Manfredy, 238 F.3d 248, 256 (3d Cir. 2001).

Jurisdiction may be asserted even when a party does not physically enter the forum state. Burger King, 471 U.S. at 476.  Although physical presence will generally enhance a party's contacts with the forum state, "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."  Id.

In Remick v. Manfredy, a suit brought by an attorney for fees for his services, the Third Circuit found that the client-defendant had minimum contacts with the state in which his attorney-plaintiff worked because the client had knowledge of the attorney's location at the point of contract formation.  Remick, 238 F.3d at 256.  Specifically, the Third Circuit held that "[m]ost of the services performed by [the attorney] on behalf of [the client] were conducted at [the attorney's] Philadelphia office, and [the client] certainly should have expected as much as he knew that [the attorney's] home office is in Philadelphia."  Id.  The Third Circuit further held that contacts between a client and his attorney regarding legal issues are "more entangling than the mere 'informational communications'" that might otherwise fail to support minimum contacts. Id. (distinguishing Vetrotex Certainteed Corp., v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 152 (3d Cir. 1996) ("[I]nformational communication in furtherance of [a contract between a resident and a nonresident] does not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over [the nonresident defendant]." (brackets in original) (quoting Sunbelt Corp. v. Noble, Denton & Assoc., Inc., 5 F.3d 28, 32 (3d Cir.1993)))).

### ii.      "Arising Out of" Contacts

The litigation must also arise out of or relate to at least one of the defendant's contacts with the forum State.  Helicopteros, 466 U.S. at 414.  The Third Circuit "requires a closer and more direct causal connection than that provided by the but-for test . . . the analysis should hew closely to the reciprocity principle upon which specific jurisdiction rests." O'Connor, 496 F.3d at 323.  If "a meaningful link exists between a legal obligation that arose in the forum and the substance of the plaintiffs' claims," the "arising out of" requirement is satisfied.  Id. at 324.

Because the Third Circuit has stated that "[t]he first two parts of the test determine whether a defendant has the requisite minimum contacts with the forum[,]" D'Jamoos, 566 F.3d at 102, the Court will use the term "minimum contacts" to refer to the first two steps together.

### iii.      Traditional Notions of Fair Play and Substantial Justice

When minimum contacts are present, the exercise of personal jurisdiction over defendants must accord with traditional notions of fair play and substantial justice.  Mesalic v. Fiberfloat Corp., 897 F.2d 696, 701 (3d Cir. 1990) (quoting Int'l Shoe Co. v. State of Wash, 326 U.S. 310, 316 (1945)).  Once a plaintiff establishes minimum contacts, the burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable," to the point of unconstitutionality.  Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 150 (quoting Burger King, 471 U.S. at 477 (1985)); see also Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1226 (3d Cir. 1992) (citing Burger King, 471 U.S. at 482).  "The burden on a defendant who wishes to show an absence of fairness or lack of substantial justice is heavy."  Grand Entm't Grp., Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 483 (3d Cir. 1993).  When determining fair play and substantial justice, courts consider

7

the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining

relief, the national judicial interest in efficient dispute resolution, and the national interest in

furthering "fundamental substantive social policies." Asahi Metal Indus. Co. v. Super. Ct., 480

U.S. 102, 113 (1987) (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292

(1980)). "When minimum contacts have been established, often the interests of the plaintiff and

the forum in the exercise of jurisdiction will justify even the serious burdens placed on the

[nonresident] defendant." Asahi, 480 U.S. at 114; see also, e.g., O'Connor, 496 F.3d at 324-25

(finding jurisdiction in Pennsylvania where the defendant, the scene of the accident, many

witnesses, and substantial evidence were located in Barbados).

### 2.     The Effects Test for Specific Jurisdiction of Torts Claims

To establish specific jurisdiction over an intentional tort claim, courts apply the "effects

test" set forth by the Third Circuit in IMO Industries, Inc. v. Kiekert AG, 155 F.3d 254, 265-66

(3d Cir. 1998). The effects test requires that: "(1) [t]he defendant committed an intentional tort;

(2) [t]he Plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the

focal point of the harm suffered . . . ; [and] (3) [t]he defendant expressly aimed his tortious

conduct at the forum. . ." Id. (summarizing Calder v. Jones, 465 U.S. 783, 788-89 (1984)).

To satisfy the first prong of this test, the plaintiff need only allege that the defendant

committed an intentional tort. See Remick, 238 F.3d at 258 (finding that the first prong was

satisfied by allegation of defamation, an intentional tort). The second prong of the test is

satisfied where the plaintiff "may reasonably contend that he suffered the brunt of the harm" in

the forum state. Id. (holding that defamation letter that questioned plaintiff's professional

abilities caused harm in the state where plaintiff primarily practiced); see also IMO Indus., 155

8

F.3d at 263 ("[I]t is true that a corporation "feels" lost sales at its headquarters. . .") (citing ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 625-26 (4th Cir. 1997)); Marlin Leasing Corp. v. Biometrieux, Inc., No. 06-cv-5609, 2007 WL 1468840, at *3 (E.D. Pa. May 16, 2007) (holding that fraudulent lease transactions caused harm in the state where plaintiff accepted the fraudulent leases and handled the leasing finances).  To satisfy the third prong of the test, the plaintiff must "point to contacts which demonstrate that the defendant expressly aimed its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity."  IMO Indus., 155 F.3d at 265 (emphasis in original).

### A.      Parties' Contentions

#### 1.      Titan's Brief

Titan argues primarily that Mendelsohn has failed to establish minimum contacts because the Engagement Letter between Titan and Mendelsohn (Ex. D to Pl.'s Sur-reply Br.) did not seek to "establish a common venture extending over a substantial period of time," but instead limited the relationship specifically to Virginia and Illinois.  Defs.' Br. at 11-12 (quoting Rotondo Weinreich Enters., Inc. v. Rock City Mech., Inc., No. 04-cv-5285, 2005 WL 119571, at *4 (E.D. Pa. Jan. 19, 2005)).  Titan adds that minimum contacts cannot be satisfied by the mere existence of a contract or the initiation of a relationship.  Id. at 11.

Regarding the torts claims under the effects test, Titan argues that Mendelsohn's complaint alleges torts aimed at Virginia and Illinois, not at Pennsylvania, because the alleged fraud sought to induce representation in the Virginia and Illinois litigations.  Id. at 14.  Next, Titan asserts that jurisdiction over Blackburn must fail because Blackburn did not enter a contract with Mendelsohn in his individual capacity.  Id. at 15.

Finally, Titan argues that jurisdiction in Pennsylvania would offend traditional notions of fair play and substantial justice because the South Carolina company has no contacts in Pennsylvania and because evidence and witnesses are located in Virginia, Illinois, and South Carolina. Id. at 15.

Titan supports its Brief with one affidavit by Blackburn in which he describes his part-time residencies in New York and South Carolina, his position at Titan, and his contacts with Mendelsohn. Blackburn Aff. ¶¶ 3-4, 7-18 (Ex. C to Defs.' Br.) Blackburn describes at length the contacts that Titan does not have with Pennsylvania. Id. at ¶¶ 7-18 (asserting that Titan and Blackburn have never conducted business, owned property, paid taxes, shipped product, or visited Pennsylvania in a professional capacity). None of the contacts mentioned by Blackburn are asserted in the Complaint. The only paragraph of consequence in the Affidavit is Blackburn's assertion that Mendelsohn's representation of Titan was "solely limited to the Illinois Litigation and the Virginia Litigation. . ." Id. at ¶ 13. However, Titan admits twice in its Brief that Mendelsohn represented Titan in the negotiation of a Sole Source Purchase Agreement with Strata. Defs.' Br. at 5 n.2, 19 n.3.

### 2.    Mendelsohn's Response

Mendelsohn responds that Titan's contacts are sufficient to support personal jurisdiction, that the effects tests is satisfied by Titan's conduct, that Blackburn is liable in his individual capacity for his substantive role in committing Titan's alleged tort, and that jurisdiction in this court would comport with fair play and substantial justice. Pl.'s Br.

Mendelsohn first presents Titan's contacts with Pennsylvania, including Titan's initiation of communication (Pl.'s Br. at 4), the unlimited nature of the contractual relationship (id. at 4-6),

10

and the extensive communications exchanged by Mendelsohn and Blackburn (id. at 6-8).

Mendelsohn also asserts that it performed a substantial amount of the litigation work at its offices

in Pennsylvania.  Id. at 7, 9.  Mendelsohn contends that the totality of these contacts, considered

with Titan's knowledge that Mendelsohn is a Philadelphia firm that would work on Titan's case

primarily in Pennsylvania, supports a finding of personal jurisdiction because the contacts prove

that Titan purposefully sought out and contracted with a Pennsylvania company, thereby availing

itself of the laws of Pennsylvania.  Id. at 9.

Mendelsohn then reasons that the claims of breach of contract and fraudulent inducement

are "inextricably intertwined with Mendelsohn's representation [of Titan], including Mr.

Blackburn's numerous [communications] with Pennsylvania attorneys . . ."  Pl.'s Br. at 13.

Regarding fair play and substantial justice, Mendelsohn challenges Titan's claims of

inconvenience by pointing out Titan's failure to specify the witnesses located outside

Pennsylvania and Blackburn's relative proximity to Pennsylvania from his part-time home in

New York.  Id. at 13-14.  Even if the inconveniences were substantiated, claims Mendelsohn,

"they would not necessarily be sufficient to divest this Court of jurisdiction," because minimum

contacts exist and Pennsylvania has a strong interest in litigation involving Pennsylvania

businesses.  Id. at 14-15.

Mendelsohn then turns to the effects test, arguing that Titan and Blackburn intentionally

aimed their fraudulent statements at Mendelsohn in Pennsylvania and that Mendelsohn indeed

felt the harm of the fraud in Pennsylvania.  Pl.'s Br. at 16.  Mendelsohn points to Blackburn's

many communications with Mendelsohn's office in Pennsylvania as evidence that Titan and

Blackburn "expressly aimed [their] tortious conduct at the forum."  <u>Id.</u> at 16 (quoting <u>IMO Indus.</u> at 265).

With respect to the claim against Blackburn, Mendelsohn explains that, although CEOs are generally not liable for actions taken in a solely corporate capacity, this District recognizes an exception for CEOs that are "<u>personally</u> involved in a corporation's tortious conduct."  Pl.'s Br. at 22 (emphasis in original).

To support this Brief, Mendelsohn submitted a Declaration by Mendelsohn attorney Kevin Drucker.  Drucker Decl. (Exs. A-D to Pl.'s Br. )  In his Declaration, Drucker supports Mendelsohn's asserted minimum contacts by describing Titan's initiation of the contractual relationship (Drucker Decl. at ¶¶ 3-4), the unlimited nature of the relationship (<u>id.</u> at ¶ 6), the performance of the contract in Pennsylvania (<u>id.</u> at ¶¶ 7, 15, 22), and the extent and nature of communications exchanged between the parties (<u>id.</u> at ¶¶ 8-11, 14, 16-19).  Drucker also attests that Mendelsohn entered only two appearances in the Virginia litigation (<u>id.</u> at ¶ 23), entered none in Illinois (<u>id.</u> at ¶¶ 25, 29), and Mendelsohn has no contacts with South Carolina beyond "the fact that Mendelsohn's former client Titan [sic] happens to have relocated its headquarters to South Carolina during the representation" (id. at ¶¶ 27-28).

Mendelsohn also submitted four emails to support its arguments.  Exs. A-D to Pl.'s Br. Exhibit A to Mendelsohn's Brief is an email sent by Titan's separate corporate counsel, Michael Semack, introducing Blackburn to a Mendelsohn attorney for the purpose of discussing representation.  Exhibit B is an email chain discussing a trademark issue, though much of the text

has been redacted.[5]  Exhibit C is a similarly redacted email discussing a patent prosecution. Finally, Exhibit D is an email from Blackburn to Mendelsohn, informing Mendelsohn that all contact should be directed at Blackburn and Mendelsohn should not attempt communication with any other Titan employee.

### 3.    Titan's Reply

In reply, Titan essentially reiterates the arguments presented in its principal Brief.  See Defs.' Reply Br.  Here, Titan focuses on the limitations of its contractual relationship with Mendelsohn, explaining that even the Sole Source Purchase Agreement was intertwined with the litigation because it was executed in reliance on Mendelsohn's advice that the litigation would be successful.  Defs.' Reply Br. at 4.  Regarding the fraud claims, Titan relies on the defense that the alleged conduct was aimed at inducing Mendelsohn's continued representation in Virginia and Illinois and was therefore not aimed at Pennsylvania.  Id. at 7-8.  Finally, Titan argues that Pennsylvania has no interest in the litigation because the Mendelsohn attorney who worked on Titan's case is not licensed to practice in Pennsylvania, and thus that jurisdiction does not comport with fair play and substantial justice.  Id. at 8.

### 4.    Mendelsohn's Sur-reply

Mendelsohn requested and was granted permission to file a Sur-reply Brief with supporting documents under seal (ECF Nos. 26-29).  Mendelsohn's Sur-reply is dedicated to challenging Titan's assertions that Mendelsohn's representation was limited to the Virginia and Illinois litigations.  Pl.'s Sur-reply Br.  Mendelsohn attacks Titan's defense by describing the

---

[5] Mendelsohn redacted these communications to avoid prejudicing Titan's ongoing litigation in Virginia.  The unredacted version was submitted under seal with Mendelsohn's Sur-reply Brief, discussed below.  However, the redacted portions are not necessary to decide this Motion.

chronology of the litigation and the services Mendelsohn provided that were unrelated to the litigation.

Mendelsohn responds to the chronology issue by claiming that the litigation was not pending during the execution of the Engagement Letter, but was instead prompted by a request for an indemnification clause in the Sole Source Purchase Agreement with Strata.[6]  Pl.'s Sur-reply Br. at 2.  Mendelsohn further describes the process of commencing litigation in which Titan chose which actions to bring and where to bring them.[7]  Id. at 3, 5.  Mendelsohn then reiterates that the very language of the Engagement Letter does not limit the contractual relationship to the Virginia and Illinois litigations.  Id. at 4.

Next, Mendelsohn describes two instances in which legal services were rendered on issues unrelated to the litigation.  Pl.'s Sur-reply Br. at 5.  The first instance was Mendelsohn's response to an inquiry by Blackburn on the process for patenting an invention.  Id.  The second occasion concerned a third party's application for a trademark that Titan had considered trademarking for itself.  Id. at 5-6.  In light of these services, Mendelsohn argues that its contractual relationship and services provided were not limited to litigation in Virginia and Illinois.  Id. at 6.

---

[6] Mendelsohn explains that the indemnification clause was included in the Sole Source Purchase Agreement because Titan had notice of patent issues "based on certain prior use and publications by one of Titan's predecessors-in-interest."  Pl.'s Sur-reply Br. at 2; Cargille Decl. at ¶ 3.

[7] Specifically, Mendelsohn asserts that Titan chose between requesting declaratory judgment in the district court and requesting patent re-examination from the United States Patent & Trademark Office.  Pl.'s Sur-reply Br. at 3.  After choosing the district court path, Mendelsohn claims that Titan then chose between four possible districts in which to file a complaint, one of which was the Western District of Pennsylvania.  Id. at 5.

In order to substantiate its assertion that non-litigation services were provided to Titan, Mendelsohn submits a Declaration by Mendelsohn associate, David Cargille, and eight exhibits. In his Declaration, Cargille describes the work he did on the Sole Source Purchase Agreement prior to litigation (Cargille Decl. at ¶ 3), the decisions made in contemplation of litigation (id. at ¶¶ 4-6, 9-10), the lack of service limitations within the contractual relationship (id. at 7-8), and the service provided outside litigation (id. at 11-12).

Of the eight attached exhibits, Exhibits A and B are emails between Mendelsohn and Blackburn referencing the patent for which Strata sought indemnity.  Exhibit C is an internal Mendelsohn email dated February 2, reporting Blackburn's contemplation of possible litigation, Blackburn's request for services outside of litigation, and Mendelsohn's need for an Engagement Letter for Titan.  Exhibit D is the Engagement Letter between Titan and Mendelsohn.  Exhibit E is an internal Mendelsohn email dated January 18, 2011, asking Mendelsohn attorneys if there are any conflicts of interest regarding representation of Titan on "various IP matters."  Exhibits H and G are emails exchanged between Mendelsohn and Blackburn regarding the patent and trademark issues.

## C.    Analysis

As noted above, Mendelsohn need only make a prima facie showing of minimum contacts for the specific jurisdiction claims for (A) the contracts claim against Titan, (B) the torts claim against Titan, and (C) the torts claim against Blackburn.

1.   **This Court Does Have Personal Jurisdiction Over Titan Regarding the Claim for Breach of Contract.**

This Court has personal jurisdiction because Mendelsohn has shown that Titan purposefully directed minimum contact activities at Pennsylvania, that this claim arises from those activities, and that jurisdiction comports with traditional notions of fair play and substantial justice.[8]   D'Jamoos, 566 F.3d at 102.

i.   **Titan Purposefully Directed its Legal Business at Pennsylvania to an Extent That Satisfies Minimum Contact Requirements.**

In determining specific jurisdiction for Mendelsohn's breach of contract claim, the Court focuses its analysis on the contacts involved in the negotiation, execution, and performance of Titan's engagement letter with Mendelsohn.  See Mellon Bank, 960 F.2d at 1224 (explaining that courts should consider, inter alia, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties actual course of dealing[,]" when evaluating personal jurisdiction) (quoting Burger King, 471 U.S. at 479 (emphasis added)); see also Deutz, 270 F.3d at 150 ("In contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach.") (citing Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999)).  Although the Engagement Letter may support this Court's personal jurisdiction over Titan, contracting with a forum citizen does not automatically establish personal jurisdiction, Burger King, 471 U.S. at 478.  The contractual relationship between Mendelsohn and Titan must be substantial enough to constitute an affirmative act by which Titan "purposefully avails [itself] of the privilege of conducting activities within the forum State."  Hanson v. Denkla, 357 U.S. 235, 253 (1958).

---

[8] The Plaintiff refers to this three-step test as the "traditional test."  Pl.'s Br. at 8.

Titan's relationship with Mendelsohn was substantial enough to establish personal jurisdiction on the contract claim because it was based on Mendelsohn's provision of legal services, involved extensive communication between parties, and was not limited by the terms of the engagement letter.

Under Remick, the contractual relationship between a client and his attorney will satisfy minimum contacts in the attorney's home state where the client was aware of the attorney's location in that state and the attorney performed legal work in that state. See 238 F.3d at 256 (finding that plaintiff-attorney performed contractual obligations in the forum state where his firm was located and defendant "certainly should have expected as much"). Here, Titan became aware of Mendelsohn's Philadelphia location upon introduction to Mendelsohn attorneys (Drucker Decl. ¶ 3, Ex. A to Pl.'s Br.), the firm included its address on all legal documentation filed on Titan's behalf (Drucker Decl. ¶¶ 11-13), the address was in almost every email and on every fax (Drucker Decl. ¶¶ 8-9), and Titan mailed one payment to Mendelsohn's Philadelphia address (Drucker Decl. ¶ 10). Under Remick, Titan "certainly should have expected" that Mendelsohn would be working in Philadelphia, even if litigation proceeded elsewhere, and Mendelsohn did indeed perform substantial work in Philadelphia.[9] See Remick, 238 F.3d at 256 (offering a finding that most legal work was performed in the firm's home state, even when negotiations and deals were performed elsewhere).

At oral argument, counsel for Titan attempted to distinguish Remick by focusing on the client's attorney-selection process. Specifically, counsel claimed that Titan did not have a hand

---

[9] Mendelsohn researched the case, drafted litigation documents, and held conferences with the other parties in Pennsylvania. Drucker Decl. ¶¶ 7, 14-15.

in selecting Mendelsohn[10] and thus did not <u>purposefully</u> avail itself to the benefits of

Pennsylvania law.  In <u>Remick</u>, on the other hand, the client-defendant sought out the attorney-

plaintiff in Pennsylvania.  <u>Remick</u>, 238 F.3d at 252.  Titan did not explain why the selection

process should be considered over the process of contract formation.  As the Court noted at oral

argument, Titan's contention is baseless because it would encourage clients to retain attorneys in

a different state than the client, and any litigation to collect fees would have to filed in the

client's home state, even though all the legal work was performed in the lawyer's home state.  No

court has ever held this, nor will this Court.

Mendelsohn and Titan engaged in substantial communication throughout the contractual

relationship.  Communications by a defendant "that create a substantial connection with the

forum State[,]" may support minimum contacts.  <u>Burger King</u>, 471 U.S. at 475-76 (citing <u>McGee</u>

<u>v. Int'l Life Ins. Co.</u>, 355 U.S. 220, 223 (1957), and        <u>Kulko v. Cal. Super. Ct.</u>, 436 U.S. 84, 94 n.7

(1978) (internal quotations omitted)).  The depth of the parties' communications further supports

the exercise of personal jurisdiction.  <u>See</u> <u>Grand Entm't</u>, 988 F.2d at 482 ("'So long as it creates

a substantial connection, even a single telephone call into the forum state can support

jurisdiction'") (quoting <u>Taylor v. Phelan</u>, 912 F.2d 429, 433 n.4 (10th Cir. 1990)); <u>Deutz</u>, 270

F.3d at 152 (finding personal jurisdiction where communications with the forum influenced the

financial well-being of the defendant company).  Although Titan employees never visited

Pennsylvania, Titan and Mendelsohn exchanged 531 emails and 38 phone calls.  Drucker Decl.

¶¶ 16, 17.  Titan also sent partial payment to Mendelsohn's Philadelphia office.  <u>Id.</u> ¶ 10.  These

---

[10]Titan was introduced to Mendelosohn via email by Titan's corporate counsel.  Ex. A to Pl.'s
Reply.

communications bore directly on the performance of the contract, including exhaustive correspondence regarding the compensation at issue in his case. See Remick, 238 F.3d at 256 (finding that communication regarding legal representation is substantive enough to support a finding of minimum contacts). This is more than enough communication to support personal jurisdiction. See Grand Entm't, 988 F.2d at 483 ("Where the contacts evaluated are those that give rise to the litigation, even one contact with the forum may be enough to justify jurisdiction as long as the other criteria are met.") (citing Burger King, 471 U.S. at 475 n.18).

Titan mischaracterizes the law and the facts by contending that its relationship with Mendelsohn was limited to the Virginia and Illinois litigations, thus precluding this Court's personal jurisdiction. See Defs.' Reply Br. at 3. In making this argument, Titan relies on Rotondo, in which Judge Padova interpreted the Deutz ruling as a limitation on personal jurisdiction where a contractual relationship pertains only to a specific, definite project without any contemplation of extended dealings.[11] 2005 WL 119571, at *4 (interpreting Deutz, 270 F.3d at 151 ("In the commercial milieu, the intention to establish a common venture extending over a substantial period of time is a more important consideration.")). Judge Padova did not rule that personal jurisdiction is barred where a contractual relationship is limited, but only that other contacts must make up for such limitations. See id. at *4-*5 (finding that "it is significant that the parties did not intend to establish a common venture extending over a substantial period of time," then continuing to analyze other minimum contacts factors) (emphasis added). While this Court believes that the Rotondo approach is essentially a minimum contacts analysis with special consideration given to the depth and longevity of the contractual relationship, following Judge

---

[11] Titan cites no other source asserting this theory on limited contractual relationships.

Padova's approach is not necessary because Titan's relationship with Mendelsohn is not limited within the meaning of Rotondo.

In Rotondo, the contract provided for completion of performance within one year, did not indicate any work to be done in the forum state, did not contemplate any continued business relationship after the project's completion, and the defendant had next to no contact with the forum state beyond the contract itself.  Id. at *1, *4-*5.  The contractual relationship here is not so limited.  While the Engagement Letter does recognize the patent at issue, it does not limit services to that litigation.  Pl.'s Br. at 4-5; Ex. D to Pl.'s Sur-reply Br.  Indeed, the paragraph directly proceeding the Virginia litigation language in the Engagement Letter explicitly contemplates provision of services "including drafting and prosecution of patent and trademark applications, registering copyrights, licensing, litigating, and rendering advice regarding intellectual properly law matters . . ." Id.  Titan did not set any time or expense limits on its relationship with Mendelsohn, see id., implying a willingness to continue indefinitely. Furthermore, Titan chose to include Mendelsohn in the Sole Source Purchase Agreement (Defs.' Br. at 5 n.2), a patent action (Ex. G to Pl.'s Sur-reply Br.), and a trademark action (Ex. H to Pl.'s Sur-reply Br.), none of which were specifically mentioned in the Engagement Letter (Ex. D to Pl.'s Sur-reply Br.).

Based on the above analysis, this Court finds that Mendelsohn has sufficiently demonstrated Titan's minimum contacts with Pennsylvania regarding the contracts claim.

> **ii.  Mendelsohn's Claims Arise Out of Titan's Contacts with Pennsylvania.**

Mendelsohn asserts in its Complaint and again within its Briefs that the claims at issue arise out of Titan's minimum contacts with Pennsylvania, Compl. ¶ 1; Pl.'s Br. at 13, and Titan does not challenge these assertions, Defs.' Br. at 11-15.  In the absence of a challenge, this court accepts Mendelsohn's allegations connecting the claim to the minimum contacts.  See Remick, 238 F.3d at 256-57 (finding specific jurisdiction for a breach of contract claim where the contract and related communications satisfied minimum contacts and neither party disputed the "arising out of" prong of personal jurisdiction the test); Marlin, 2007 WL 1468840, at *3 ("Although Plaintiff's allegations in connection with this ["arising out of"] prong are rather cursory, Defendants have not presented sufficient evidence to refute them.")

> **iii.  The Exercise of Personal Jurisdiction Over Titan Would Comport With Traditional Notions of Fair Play and Substantial Justice.**

Titan claims that litigating in Pennsylvania would be burdensome because important witnesses are located in South Carolina, Virginia, and Illinois.  Defs.' Br. at 15.  Titan fails to suggest who those witnesses would be and why an appearance in Pennsylvania would be particularly difficult.  Id.  This lack of detail, coupled with the fact that "[m]odern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," defeats Titan's inconvenience argument.  See Utilitech, Inc. v. Somerset Med. Ctr., No. 06-cv-1232, 2006 WL 1687046, at *5 (E.D. Pa. June 15, 2006) (quoting Deutz, 270 F.3d at 150 (quotations, citations, and brackets omitted)).

Titan then argues that Pennsylvania does not have an interest in the litigation because the Mendelsohn attorney who worked on Titan's case is not licensed to practice in Pennsylvania. Defs.' Reply Br. at 8.  Pennsylvania's interest in litigation is not limited by the licensure of the parties, but concerns the residency of the parties and the business conducted within the state.  See McGee, 355 U.S. at 223 (finding that a state has a "manifest interest in providing effective means of redress for its residents . . ." regarding contractual relationships); Grand Entm't, 988 F.2d at 483 (finding state interest where resident seeks redress for a harm allegedly caused by the defendant within the forum); Deutz, 270 F.3d at 152 (finding a state interest on a claim regarding business conducted in the forum state).  Titan fails to demonstrate that this Court's exercising jurisdiction over Titan on this claim would be unfair.

## 2.  This Court Does Have Personal Jurisdiction Over Titan Regarding the Claim for Fraudulent Inducement.

Mendelsohn claims that Titan committed fraud by purposefully issuing false assurances to Mendelsohn that payment was forthcoming, thereby inducing Mendelsohn to continue representation without pay.  Compl. ¶¶ 164-68, 172.  Specific personal jurisdiction for tort actions can be demonstrated by the traditional minimum contacts test discussed above or by the effects test.  Because this fraud claim is based on communication regarding performance of a contract, the above minimum contacts analysis is applicable here, with emphasis on the communications regarding payment.[12]  Marlin, 2007 WL 1468840, at *2 (finding minimum contacts where fraud claims arose directly out of contractual contacts).  Applying the effects test,

---

[12] Contacts regarding payment include the exhaustive electronic conversations on the topic (Compl. ¶¶ 33-39; see also Drucker Decl. ¶¶ 16-21), the payment received by Mendelsohn (Compl. ¶¶ 24; Drucker Decl. ¶ 10), and the payments allegedly sent but never received (Compl. ¶¶ 46-48, 72-76).

set forth by the Third Circuit in IMO Industries, this Court finds that: (1) Mendelsohn alleged the intentional tort of fraudulent inducement; (2) Mendelsohn felt the brunt of the harm in Pennsylvania such that Pennsylvania can be said to be the focal point of the harm suffered; and (3) Titan expressly aimed its fraudulent conduct at Pennsylvania.  See 155 F.3d at 265-66.

Mendelsohn has satisfied the first prong of the effects test by alleging that Titan committed fraud, an intentional tort.  See Remick, 238 F.3d at 258 (finding that the plaintiff satisfied the first prong by alleging an intentional tort); Marlin, 2007 WL 1468840, at *3 (same). Regarding the second prong, Mendelsohn's main office is located in Pennsylvania and payments for representation were due in Pennsylvania.  Compl. at 1; Drucker Decl. ¶¶ 7-10.  Mendelsohn claims that it felt the brunt of the harm in Pennsylvania and Titan does not refute that claim. Pl.'s Br. at 16; Defs.' Reply Br. at 7-8.

"In order to make out the third prong of the test, the plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum."  IMO Indus., 155 F.3d at 266.  Here, Titan argues that its conduct was not aimed at Pennsylvania because the alleged fraud was meant to induce Mendelsohn to continue litigation in Virginia and/or Illinois, not to induce action in Pennsylvania.  Defs.' Reply Br. at 7-8.  However, as mentioned above, the Third Circuit has determined that an attorney's work is done at the location of the firm, not the location of legal action.  Remick, 238 F.3d at 256.  Titan knew that Mendelsohn's offices were located in Pennsylvania and that payment was to be sent to the Pennsylvania office.  Compl. ¶ 24; Drucker Decl. ¶¶ 8-11.  Titan's allegedly fraudulent assurances of payment, were purposefully directed at

23

Mendelsohn's offices in Pennsylvania.  Compl. ¶¶ 33-34.  <u>See</u> <u>Marlin</u>, 2007 WL 1468840, at *3

(holding that the third prong was satisfied when defendant made fraudulent communications

directly to the forum state). <u>Compare</u> <u>Vector Sec., Inc. v. Corum</u>, No. 03-cv-741, 2003 WL

21293767, at *4 (E.D. Pa. Mar. 21, 2003) (concluding that defendant expressly aimed fraudulent

conduct at forum by sending and directing emails to the plaintiff in the forum), <u>with</u> <u>IMO Indus.</u>,

155 F.3d at 267 (holding that plaintiff failed to demonstrate third prong where defendant did not

directly communicate with the forum state).  Titan offers no reason why this court should

consider the allegedly intended consequences of communication over the actual communication

itself.  Defs.' Reply Br. at 8.

        In sum, Mendelsohn has demonstrated this Court's jurisdiction over Titan with regards to

the fraudulent inducement claim because Titan has sufficient minimum contacts with

Pennsylvania and Titan's alleged intentional tort was aimed at, and caused the most harm in,

Pennsylvania.  For the same reasons discussed under the contracts claim analysis, this Court's

exercise of jurisdiction over Titan would not offend traditional notions of fair play and

substantial justice.

> **3.    This Court has Personal Jurisdiction Over Blackburn Regarding the Claim for Fraudulent Inducement.**

        Mendelsohn's claim against Blackburn is essentially identical to the fraud claim against

Titan, but seeks to hold Blackburn liable in an individual capacity for his direct involvement with

Titan's allegedly fraudulent conduct.  Compl. ¶¶ 164-69.  Because Blackburn individually

participated in the communications discussed above and served as Mendelsohn's sole contact

with Titan, Drucker Decl. ¶¶ 18-21; Ex. D to Pl.'s Br., the previous personal jurisdiction analyses

apply to Blackburn.  The question, then, is whether this Court may exercise personal jurisdiction

over Blackburn in an individual capacity for actions taken in the course of his official duties at

Titan.  The Court concludes that Blackburn should be subject to personal jurisdiction because he

was a "key player" in Titan's corporate structure and personally involved in the alleged tort.

Judge Joyner aptly stated the applicable law as follows:

> Generally, "'[i]ndividuals performing acts in a state in their corporate capacity are not subject to the personal jurisdiction of the court of that state for those acts.'" Nat'l Precast Crypt Co. v. Dy-Core of Pa., Inc., 785 F. Supp. 1186, 1191 (M.D. Pa. 1992) (quoting Bowers v. NETI Techs, Inc., 690 F. Supp. 349, 357 (E.D. Pa. 1988)). . . . However, a recognized exception to this general rule is that a "corporate agent may be held personally liable for torts committed in their [sic] corporate capacity." Nat'l Precast Crypt Co., 785 F. Supp. at 1191.  The courts recognizing this exception allow personal jurisdiction in such circumstances so the corporate defendant will "not be able to use the corporate shield to protect himself from suit in the forum." Beistle [Co. v. Party U.S.A., Inc., 914 F. Supp. 92, 96 (M.D. Pa. 1996)]; see also Maleski [v. D.P. Realty Trust, 653 A.2d 54, 63 (Pa. Cmwlth. 1994)] (stating "unless jurisdiction is obtained over those corporate officers engaged in tortious conduct, they will merely repeat the conduct over and over in other corporate guises").

Elbeco Inc. v. Estrella de Plato, Corp., 989 F. Supp. 669, 676 (E.D. Pa. 1997).  In Al-

Khazraji v. Saint Francis College, the Third Circuit recognized this exception personal

jurisdiction over corporate officers, holding that "'[a]n officer of a corporation who takes part in

the commission of a tort by the corporation is personally liable therefore.'"  784 F.2d 505, 518

(3d Cir. 1986) (applying the exception to a race discrimination case under 42 U.S.C. § 1981)

(quoting Zubik v. Zubik, 384 F.2d 267, 275-76 (3d Cir. 1967)).

Those cases that have not recognized the exception have done so primarily because the

individual officer did not have sufficient minimum contacts with the forum state in his

individual capacity, reasoning that the corporate officer had not purposefully availed himself to every state in which the corporation did business by becoming involved with a corporate tort. See PSC Prof'l Servs. Grp., Inc. v. Am. Digital Sys., Inc., 555 F. Supp. 788, 792 (E.D. Pa. 1983) (Luongo, C.J.); Simpson v. Lifespring, Inc., 572 F. Supp. 1251, 1253 (E.D. Pa. 1983) (Weiner, J.); Simkins Corp. v. Gourmet Res. Intern., 601 F. Supp. 1336, 1345 (E.D. Pa. 1985) (Giles, J.). This limitation does not apply to Blackburn because, as mentioned above, he was individually responsible for all of Titan's communications with Mendelsohn in Pennsylvania, going so far as to forbid Mendelsohn's communication with any other Titan employee.  Drucker Decl. ¶¶ 18-21; Ex. D to Pl.'s Br.  Although Blackburn did not personally enter a contractual relationship with Mendelsohn, the extensive and substantive communication that Blackburn exchanged with Mendelsohn satisfies his personal minimum contacts because those communications serve as the basis for the fraud action.  See Beistle, 914 F. Supp. at 96 (finding personal minimum contacts satisfied where corporate officer traveled to and communicated with forum state to promote the sales of tortiously copied materials); Rittenhouse & Lee v. Dollars & Sense, Inc., No. 83-cv-5996, 1987 WL 9665, at *5 (E.D. Pa. Apr. 15, 1987) (finding personal minimum contacts satisfied where corporate officer communicated heavily with forum state to execute the deal at issue).

In order to determine whether a corporate officer will be subject to personal jurisdiction, the following factors should be examined: "the officer's role in the corporate structure, the quality of the officer's contacts, and the extent and nature of the officer's participation in the alleged tortious conduct."  Maleski, 653 A.2d at 63; see also TJS Brokerage & Co., Inc. v. Mahoney, 940 F. Supp. 784, 788-89 (E.D. Pa. 1996).  An officer's role in the defendant

company may satisfy the test where the officer was a "key player in the corporate structure," Rittenhouse, 1987 WL 9665 at *5, "with apparent authority to commit the corporation to contracts and to represent the corporation in contractual discussions and obligations," Elbeco, 989 F. Supp. at 677.  An officer's contacts and participation may satisfy the test where he was so substantially involved with the plaintiff and the alleged tort that "he should not be permitted to use the corporate shield to protect himself from liability."  Rittenhouse, 1987 WL 9665 at *5.

Here, Blackburn wears the title "Chief Executive Officer," Blackburn Decl. at ¶ 3; Ex. C to Defs.' Br., and personally handled legal issues of great consequence for Titan, including Mendelsohn's Engagement Letter, Compl. ¶ 11, and all communications with Mendelsohn during Titan's litigation, Drucker Decl. ¶¶ 18-21; Ex. D to Pl.'s Br.  As Mendelsohn's sole contact, Blackburn personally sent the allegedly false assurances upon which Mendelsohn relied in continuing representation without pay.  Compl. ¶¶ 34, 77; Drucker Decl. ¶¶ 18-21; Ex. D to Pl.'s Br.  Considering these facts, Blackburn appears to be a "key player" in the Titan corporate structure and the employee responsible for Titan's contractual relationship with Mendelsohn. See Rittenhouse, 1987 WL 9665, at *5 (finding individual personal jurisdiction for a corporate officer who handled all aspects of the deal at issue); Elbeco, 989 F. Supp. at 677 (finding individual personal jurisdiction where the defendant was the corporate officer, director, and shareholder with substantial influence over the deal at issue); Beistle, 914 F. Supp. at 96-97 (finding individual personal jurisdiction for a corporate officer who "performs basically everything it takes to run [the] . . . business" at issue).

Based on this analysis, Blackburn is subject to this Court's personal jurisdiction in his individual capacity for his personal participation in the torts alleged against Titan.

### D.      Conclusion on Personal Jurisdiction

Based on the foregoing analysis, this Court does have personal jurisdiction over Mendelsohn's claims against Titan and Blackburn.  Titan's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) is therefore denied.

## V.      Improper Venue

Titan moves for dismissal or transfer of venue pursuant to 28 U.S.C. §§ 1391 and 1404. Section 1391 states that venue is appropriate in (1) the judicial district in which any defendant resides if all defendants are residents of the forum state, (2) a judicial district in which a "substantial part of the events or omissions giving rise to the claim occurred," or (3) failing the above two options, a judicial district that has personal jurisdiction over the defendants.  Section 1404 provides for dismissal and transfer of cases brought in an improper venue.

This Court is a proper venue for this case under the second and third options of Section 1391. As discussed above, Mendelsohn performed a substantial part of its contractual duties in Pennsylvania and the missing payment for that work was due in Pennsylvania.  See Cottman Transmission Sys, Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994) (explaining that venue analysis focuses on the location of the events or omissions, not the defendants, contacts with the judicial district in question); Remick, 238 F.3d at 246 (finding that an attorney's work is done primarily at his home office, not in the forums of pending legal issues).  Finally, as discussed above, this court has personal jurisdiction over both Titan and Blackburn.  See Jumara v. State Farm, 55 F.2d 873, 878-79 (3d Cir. 1995) (finding that venue was proper in the district where the plaintiff resided, the defendant transacted business, the pertinent contract was signed, and

the events giving rise to the case occurred).  Therefore, Titan's Motion to Dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(3) is denied.

## VI.    Dismissal on the Merits

### A.    Legal Standard

#### 1.    12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6),

courts may look only to the facts alleged in the complaint and its attachments.  Jordan v. Fox,

Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).  Courts must accept as true

all well-pleaded allegations in the complaint and view them in the light most favorable to the

plaintiff.  Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).

A valid complaint requires only "a short and plain statement of the claim showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Iqbal clarified that the

Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), which required a

heightened degree of fact pleading in an antitrust case, "expounded the pleading standard for 'all

civil actions.'"  555 U.S. at 684.

Iqbal explained that although a court must accept as true all of the factual allegations

contained in a complaint, that requirement does not apply to legal conclusions; therefore,

pleadings must include factual allegations to support the legal claims asserted.  Id. at 678, 685.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  Id. at 678 (citing Twombly, 550 U.S. at 555); see also Phillips v.

29

County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." (citing Twombly, 550 U.S. at 556 n.3)).  Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

After Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two part analysis: first, the factual and legal elements of a claim should be separated–the district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions; second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  In other words, a complaint must do more than allege the plaintiff's entitlement to relief: a complaint has to "show" such entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

### 2.    Claim for Fraudulent Inducement

In Pennsylvania, a party claiming fraud must allege: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."  PPG Indus., Inc. v. Generon IGS, Inc., 760 F. Supp. 2d 520, 527 (W.D. Pa. 2011) (quoting Manning v. Temple Univ., No. 03-cv-4012, 2004 WL 3019230, at *10 (E.D. Pa. Dec. 30, 2004) (quoting Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994))).

30

For allegations of fraud, Rule 9(b) of the Federal Rules of Civil Procedure requires "the circumstances constituting fraud or mistake [to] be stated with particularity," though the Third Circuit has cautioned against focusing too narrowly on Rule 9(b)'s particularity language. Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). Instead, a court should focus on whether the complaint "adequately describes the nature and subject of the alleged misrepresentation." Id.; see also Freedom Med. Inc. v. Gillespie, 634 F. Supp. 2d 490, 515-16 (E.D. Pa. 2007) (finding fraud allegations insufficient where they do not "indicate the date, time, or place of any misrepresentation, nor do they provide an alternative means of injecting precision and some measure of substantiation into the fraud allegations" (quoting Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004))).

### 3.    Gist of the Action Doctrine

The gist of the action doctrine "serves to preserve the conceptual distinction between breach of contract claims and torts claims," by "preclud[ing] one from pursuing a tort action for the breach of contractual duties." Bishop v. GNC Franchising LLC, 248 F. App'x 298, 299 (3d Cir. 2007) (citing eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002) and Am. Guar. & Liab. Ins. Co v. Fojanini, 90 F. Supp. 2d 615, 624-25 (E.D. Pa. 2000)).  While the Pennsylvania Supreme Court has not yet applied this doctrine, Pennsylvania state and federal courts have predicted it would do so.  See Williams v. Hilton Grp. PLC, 93 F. App'x 384, 385 (3d Cir. 2004); eToll, 148 F. App'x at 14.  When applying state common law that the state supreme court has not yet recognized, federal courts must attempt to predict how the state supreme court will eventually rule, and apply the law accordingly.  U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co., 80 F.3d 90, 93 (3d Cir. 1996).  "In making such determinations, we give

due deference to the decisions of lower [state] courts.  The rulings of intermediate appellate

courts must be accorded significant weight and should not be disregarded absent a persuasive

indication that the highest state court would rule otherwise."  Id. (internal citations omitted).  The

Third Circuit has further explained, "if we were torn between two competing yet sensible

interpretations of Pennsylvania law . . . we should opt for the interpretation that restricts liability,

rather than expands it, until the Supreme Court of Pennsylvania decides differently."  Werwinski

v. Ford Motor Co., 286 F.3d 661, 680 (3d Cir. 2002) (citing City of Philadelphia v. Baretta

U.S.A. Corp., 277 F.3d 415, 421 (3d Cir. 2002)).

In the seminal state case on the gist of the action doctrine, eToll, Inc. v. Elias/Savion

Advertising, Inc, the Pennsylvania Superior Court canvassed federal case law on the doctrine and

summarized it as follows:

> [T]he cases seem to turn on the question of whether the fraud
> concerned the performance of contractual duties.  If so, then the
> alleged fraud is generally held to be merely collateral to a contract
> claim for breach of those duties.  If not, then the gist of the action
> would be fraud, rather than any contractual relationship between the
> parties.

811 A.2d at 19.  The Superior Court then concluded, "until our Supreme Court holds

otherwise, the gist of the action doctrine should apply to claims for fraud in the performance of a

contract."  Id. at 20 (emphasis added).  Subsequently, the Superior Court clarified its position on

fraud in the inducement, holding that "the law appears to permit fraud in the inducement claims

in disputes involving contractual obligations, notwithstanding that the gist of the action doctrine

would bar claims of fraudulent (non)performance."  The Brickman Grp., Ltd. v. CGU Ins. Co.,

865 A.2d 918, 928 (Pa. Super. Ct. 2004); see also Sullivan v. Chartwell Inv. Partners, LP, 873

A.2d 710, 719 (Pa. Super. Ct. 2005) (finding that, in a context where "[the plaintiff]'s tort claims relate to the inducement to contract, they are collateral to the performance of the contracts and therefore, are not barred by the gist-of-the-action doctrine."); Mirizio v. Joseph, 4 A.3d 1073, 1085 (Pa. Super. Ct. 2010) (finding that the defendant's "actions constituted fraud in the inducement, and therefore, the claim for fraud and misrepresentation was not barred by the gist of the action doctrine").

The Third Circuit has warned against a precisely-worded test for the gist of the action, opting instead for a "fact-intensive judgment as to the true nature of the claim." Williams, 93 F. App'x at 386. In Williams, the Third Circuit determined that, although the plaintiff claimed fraud in the inducement, not fraud in the performance, "the 'gist' of Williams's claims sound[ed] in contract, not tort," because the inducement resulted in a contractual relationship. Id. at 386-87.[13]

The Third Circuit reemphasized the importance of this fact-intensive analysis in Pediatrix Screening, Inc. v. TeleChem International, Inc., 602 F.3d 541, 550 (3d Cir. 2010). In Pediatrix, the Third Circuit did not adopt the Superior Court's categorical approach to fraud in the inducement claims. Compare id., with Brickman, 865 A.2d at 928, and Sullivan, 873 A.2d at 719, and Mirizio, 4 A.3d at 1087. See also Vives v. Rodriguez, No. 09-cv-2728, 2012 WL 298760, at *8-*12 (E.D. Pa. Jan. 31, 2012) (Dalzell, J.) (summarizing evolution of the gist of the action doctrine in Pennsylvania Superior Court and Third Circuit cases applying Pennsylvania law). Instead, the Third Circuit ruled that the gist of the action test "requires the court to focus

---

[13] Judge Becker dissented on this point, asserting that "where, as here, there was fraudulent intent, i.e. a subjective and undisclosed intent not to perform, a fraud claim has been stated." Williams, 93 F. App'x at 389-90.

on the substance of the dispute, or, more colloquially, to ask the question, 'What's this case really about?' The doctrine deals less with specific enumerated 'duties' than with the parties' conduct as it relates to the contract and the tort alleged."  Pediatrix, 602 F.3d at 550.

### B.     Parties' Contentions

#### 1.     Titan's Brief

Titan argues that Mendelsohn's fraudulent inducement claim is barred by the gist of the action doctrine because it is predicated upon Titan's contractual relationship with Mendelsohn. Defs.' Br. at 19.  Because the claim arises out of Blackburn's alleged intent to induce Mendelsohn to performing under the contract and Titan's failure to pay as agreed upon in the contract, Titan claims that the alleged fraud "cannot be said to be collateral to the contract."  Id. at 20 (emphasis in original).  As such, Titan characterizes the fraudulent inducement claims as impermissible claims for fraud in the performance of the contract.  Id. at 21.

Under this characterization of the claim, Titan urges the Court to follow Bengal Converting Services, Inc. v. Dual Printing, Inc., in which Judge Pratter determined that a fraud claim was barred under the gist of the action doctrine when a consumer deceived a producer into sending product when the consumer had no intent to pay.  No. 11-cv-6375, 2012 WL 831965, at *3 (E.D. Pa. Mar. 3, 2012); Defs.' Br. at 21.

Titan further argues that Mendelsohn's continued representation of Titan was not based on Blackburn's communications, but instead on Mendelsohn's legal obligation to continue representation until excused by a court.  Id. at 22-23.  According to Titan, Mendelsohn's claim fails because Mendelsohn did not allege in the complaint that a court would have released

Mendelsohn from its obligation to represent Titan had Mendelsohn moved for withdrawal sooner. Id. at 23-24.

## 2. Mendelsohn's Response

Mendelsohn responds that the gist of the action doctrine does not apply to this case because the contractual relationship was collateral to Blackburn and Titan's material representations. Pl.'s Br. at 30-31. In an attempt to distinguish Bengal from the case at bar, Mendelsohn insists that the allegedly false reassurances issued by Blackburn were "not a mere breach of contract, but rather, [were] collateral to the contractual obligations . . . and arose from separate and independent events." Id. Mendelsohn describes the "separate and independent events" as the instances in which Mendelsohn would have withdrawn representation, but refrained from doing so due to Blackburn's promises. Id. This deceit, claims Mendelsohn, did not breach a duty formed by the contract because honesty was not Titan's contractual duty, but a general duty imposed by society. Id. at 32.[14]

Responding to the issue of reliance, Mendelsohn points out that it had no obligation to continue representation in Illinois because Mendelsohn was not counsel of record in those proceedings, but merely advising counsel. Id. at 34. To support this factual assertion, Mendelsohn submits a declaration by attorney Kevin Drucker. Drucker Decl. at ¶ 7. Mendelsohn contends that its continued service on the Illinois litigation was entirely reliant on Blackburn's reassurances. Id.

---

[14] At oral argument, Mendelsohn again attempted to distinguish Bengal by claiming that the defendant in Bengal made promises he did not intend to keep while Blackburn affirmatively lied about actions he had not taken.

Regarding the Virginia litigation, Mendelsohn offers Judge Jones's quick decision on the Motion for Withdrawal[15] in Mendelsohn's favor as evidence that the Motion would have likely been granted sooner.  Id.  Nevertheless, argues Mendelsohn, the real question of reliance depends on Mendelsohn's actions, not the speculative actions of a now-distant judge.  Id.  Mendelsohn claims that it can prove its justifiable reliance on Blackburn's words if given the opportunity to fully litigate the fraudulent inducement claims.  Id. at 35.[16]

### 3. Titan's Reply

In reply, Titan entreats the Court to look past Mendelsohn's characterizations of the fraud claims and to follow Bengal, which Titan interprets as a categorical ban on fraudulent inducement claims that relate to a party's intent to perform under a contract.  Defs.' Reply Br. at 9.  After reiterating the applicability of Bengal to the case at bar, Titan concludes that it is immaterial that Mr. Blackburn was not a party to the contract[17] and requests that the Court dismiss Mendelsohn's fraudulent inducement claims.

### C. Analysis

The Court will deny Titan's Motion to Dismiss Mendelsohn's fraudulent inducement claims because Mendelsohn adequately pleaded its claim for fraudulent inducement and the claim is not barred by the gist of the action doctrine.

---

[15] Judge Jones of the Eastern District of Virginia granted Mendelsohn's Motion for Withdrawal twelve days after filing, despite two letters and one email from Mr. Blackburn opposing the Motion.

[16] This is Mendelsohn's last word on the matter because its Sur-reply brief (ECF No. 30) was dedicated entirely to issues of personal jurisdiction.

[17] Mendelsohn never raised this issue.

Mendelsohn satisfied the pleading requirements of fraudulent inducement by alleging with specificity that Mr. Blackburn, on behalf of Titan, knowingly made false representations regarding forthcoming payments with the intent to mislead Mendelsohn into continuing its legal representation, resulting in Mendelsohn's increased financial damages.  See PPG Indus., 760 F. Supp. 2d at 527 (laying out the requirements of a fraud claim in Pennsylvania) (citing Hart v. Arnold, 884 A.2d 316, 340 (Pa. Super. Ct. 2005));  Seville Indus., 742 F.2d at 791 (explaining that fraud claims must "adequately describes the nature and subject of the alleged misrepresentation").

Pursuant to Williams and Pediatrix, this Court will avoid any categorical application of the gist of the action doctrine, engaging instead in a fact-intensive analysis of the parties' conduct in relation to the fraud alleged.  See Williams, 93 F. App'x at 385; Pediatrix, 602 F.3d at 550. Where the alleged fraud induced the plaintiff to continue under a contract with the defendant, judges in this district have refused to dismiss the claim under the gist of the action doctrine.  See Mill Run Assocs. v. Locke Prop. Co., 282 F. Supp. 2d 278, 290-91 (E.D. Pa. 2003) (denying motion to dismiss fraudulent inducement claim under the gist of the action doctrine where the plaintiff alleged that he was fraudulently induced to "continue under the terms of the [a]greement") (Scuderi, J.); Weed v. Ally Fin., Inc., No. 11-cv-2808, 2011 WL 3803719, at *5 (E.D. Pa. Aug. 26, 2011) (Tucker, J.) (finding an exception to the gist of the action doctrine where the plaintiff alleged that he was "fraudulently induced to continue under the contracts . . . by injecting additional capital"); Air Prods. and Chems., Inc. v. Eaton Metal Prods., 256 F. Supp. 2d 329, 342 (E.D. Pa. 2003) (finding that the gist of the action doctrine did not bar a claim for fraudulent inducement when the defendant fraudulently misrepresented his objective

37

qualifications to perform his contractual obligations). But see Bengal, 2012 WL 831965, at *3-*4 (Pratter, J.) (dismissing a fraudulent inducement claim under gist of the action doctrine where the plaintiff alleged that he was induced to continue on under an agreement implied by an extended course of dealing).

Construing the alleged facts in the light most favorable to Mendelsohn and considering the communications discussed at length above, Titan and Blackburn knowingly induced Mendelsohn to continue its legal representation through fraudulent misrepresentations about Titan's forthcoming payment of legal fees. This fraudulent inducement is collateral to Titan's contract with Mendelsohn because it constitutes a breach of duties of honesty imposed by society, not contractual duties contained in the Engagement Letter. See, e.g., Mill Run, 282 F. Supp. 2d at 290-91. As such, Mendelsohn's fraudulent inducement claims are not barred by the gist of the action doctrine.

### D.    Conclusion on 12(b)(6) Motion

Based on the reasoning above, Titan's Motion to Dismiss the fraudulent inducement claims under the gist of the action doctrine is denied.

## VII.   Conclusion

For the reasons discussed above, Titan's Motion to Dismiss Mendelsohn's claims for lack of personal jurisdiction, improper venue, and failure to state a claim is denied in its entirety.

O:\CIVIL 12\12-453 Mendelsohn v Titan\Mendelsohn Memo MTD.wpd